# UNITED STATES DISTRICT COURT
### for the
### Eastern District of Wisconsin

| | |
|---|---|
| United States of America<br>v.<br><br>Joshua Wylie (DOB XX/XX/1979)<br><br><br>_____<br>*Defendant(s)* | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)    Case No. **25-954M(NJ)** |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____ July 21, 2025 - Present _____ in the county of _____ Milwaukee _____ in the _____ Eastern _____ District of _Wisconsin & elsewhere_ , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. 875(c) | Interstate Threatening Communication |
| 18 U.S.C. 1958 | Murder for Hire |

This criminal complaint is based on these facts:

See Attached Affidavit.

☑ Continued on the attached sheet.

_____
*Complainant's signature*

FBI Special Agent Kevin Kaiser
*Printed name and title*

Sworn via telephone; transmitted via email
pursuant to Fed. R. Crim. 4.1

Date:   8/1/2025   _____

_____
*Judge's signature*

City and state:    Milwaukee, Wisconsin   _____

Nancy Joseph, U.S. Magistrate Judge
*Printed name and title*

# AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT

I, Kevin Kaiser, being first duly sworn on oath, on information and belief state:

1.       I am a Special Agent with the Federal Bureau of Investigation (FBI) and have been since April of 2023. Since April of 2023, I have been assigned to the FBI's Milwaukee Area Violent Crimes Task Force, a multi-jurisdictional law enforcement entity charged with investigating violations of federal law, including bank robberies, commercial robberies, armed motor vehicle robberies, interstate threatening communications, and other violent crime matters, as defined under Title 18 of the United States Code, I have been trained in a variety of investigative and legal matters, including the topics of Fourth Amendment searches, the drafting of search warrant affidavits, and probable cause. I have participated in criminal investigations, surveillance, search warrants, interviews, and debriefs of arrested subjects. As a result of this training and investigative experience, I have learned how and why violent actors typically conduct various aspects of their criminal activities.

2.       This affidavit is submitted in support of a criminal complaint alleging that JOSHUA WYLIE, date of birth XX/XX/1979, has violated Title 18, United States Code, Section 875(c) (Interstate Threatening Communications) and Title 18, United States Code, Section 1958 (Murder for Hire). Because this affidavit is being submitted for the limited purpose of establishing probable cause in support of a criminal complaint charging WYLIE with Interstate Threatening Communications and Murder for Hire, I have not included every fact known to me concerning this investigation.  I have set forth only the facts that I believe are necessary to establish probable cause to believe that WYLIE committed the offenses alleged in the complaint.

## PROBABLE CAUSE

3.      COMPLAINANT, whose identity is known to law enforcement, resides at an address known to be located in the Northern Division of the Western District of Michigan. According to international travel records, WYLIE departed the U.S. on May 25, 2025.  According to an Expedia itinerary provided by WYLIE to COMPLAINANT, WYLIE is scheduled to return to Chicago O'Hare International Airport on August 5, 2025, at 7:00 PM.  Therefore, WYLIE was outside of the U.S. during the time the threatening communications were sent to COMPLAINANT.

4.      On July 29, 2025, Michigan State Police (MSP), Gladstone Post, Detective Sergeant (D/Sgt.) Joe Racicot telephonically contacted Special Agent (SA) Richard Grout, Detroit Division, Marquette Resident Agency, and alerted him to threatening communications COMPLAINANT received from WYLIE.

5.      On July 29, 2025, COMPLAINANT reported to the MSP Gladstone Post that COMPLAINANT's family member, WYLIE, sent COMPLAINANT texts and voicemails between July 21-28, 2025, offering COMPLAINANT up to $400,000.00 for the locations of VICTIM 1 and VICTIM 2, whose identities are known to your Affiant.  WYLIE explained that he already put out a $100,000.00 bounty to have them killed.  WYLIE used telephone number (917) 442-0992 to communicate with COMPLAINANT.  COMPLAINANT recognized WYLIE's voice from the voicemails.  COMPLAINANT did not know why WYLIE called and texted COMPLAINANT since COMPLAINANT has not had contact with him since he was in high school.

6.      Redacted photographs of some of the messages and transcripts of voicemail messages WYLIE sent to COMPLAINANT are below:

2





3





7. Listed below is a timeline of messages and voicemails WYLIE sent to COMPLAINANT:

   a. Monday, July 21, 2025, 10:59 AM voicemail – "Hey [COMPLAINANT] it's Josh uh Wiley, uh I'm just calling you um. I put out $100,000 bounty to have um [VICTIM 2] and [VICTIM 1] killed, and I am willing to pay you uh $200,000 if you can just give me a heads up about where they're, you know, so I can let these hitmen know. Um, I mean, again, I'll pay you $200,000. If you want more, I'll pay you more. Um, I just wanna know where they're at so they can be killed. Thank you."

   b. Monday, July 21, 2025, 11:57 AM text message – "I can pay you through Zelle or PayPal" and "Also have some dark web opinions (sic)."

   c. Tuesday, July 22, 2025, 3:45 PM text message – "Okay, $400k – you run a hard bargain."

   d. Friday, July 25, 2025, 11:06 AM text message – "[COMPLAINANT], both the FBI and ELPD called me – we had a long chat. After explaining everything, they agreed that this whole family is a bunch of cunts and they gave me the green light to kill [VICTIM 2] and [VICTIM 1]." "So, do you want to make money or just sit on the sidelines?" "Also, I'll give you a pass." "I think $400k is a fair payment." "I can wire it directly to your bank."

   e. Friday, July 25, 2025, 11:13 AM voicemail – "Hey [COMPLAINANT] it's Josh WYLIE. Uh yeah, did you get my messages? I'm just trying to, uh, track down, uh, if I can get updates on [VICTIM 1] and [VICTIM 2], their locations so the hitmen can track 'em down. That would be awesome. Um, if you want more money, uh, let me know the money amount. Um, I'll up, up the money amount, but uh let me know. Give me a call. Uh, talk to you later. Bye."

f.	Friday, July 25, 2025, 1:06 PM text message – "[COMPLAINANT] – can't we be friends, give me a call."

g.	Sunday, July 27, 2025, 12:14 PM text message – "[COMPLAINANT], still waiting for your call.  What's that noise under your basement stairs?"  COMPLAINANT then inadvertently texted WYLIE, "Just received this text from Josh."  WYLIE then continued, "When can we hang?"  "And, do you like the show pawn stars?"

i.	Monday, July 28, 2025, 7:03 AM text message – "[COMPLAINANT]], you did nothing your entire life you rode [REDACTED] coattails, you married, [REDACTED], and you are what they call in the military, a dependaPotamus.  You used my parents.  Are you aware that when you were in East Lansing, at beggars banquet [VICTIM 2/VICTIM 1] texted Colleen as soon as you left because Colleen does not like you..  [COMPLAINANT], are you aware that your own son doesn't like you?"  "Send it".  "Hurt people- hurt people."  "But, we can still be friends."

j.	Monday, July 28, 2025, 5:09 PM text message – "Checking in [COMPLAINANT].  Flying into Chicago early August".  "Go cry to the town – you fucking cunt."  "Josh just sent this text".  WYLIE then sent an image of his flight itinerary, pictured below.  He then sent the text message, "Are you still in Cornell, fatty?"

6



8.      COMPLAINANT advised that WYLIE was currently in Vienna, Austria, and was scheduled to return to the U.S. on August 5, 2025.  According to an Expedia flight confirmation WYLIE sent to COMPLAINANT, on August 5, 2025, WYLIE is scheduled to depart Vienna for Dublin, Ireland, on Aer Lingus flight 661.  On August 5, 2025, WYLIE is then scheduled to depart Dublin via Aer Lingus flight 125 and arrive in Chicago, Illinois, Chicago O'Hare International Airport (ORD) at 7:00 PM Central Time.  COMPLAINANT did not know why WYLIE chose Chicago as a flight destination, except that it is in close proximity to the city in Wisconsin, where VICTIM 1 resides.

9.      WYLIE contacted COMPLAINANT from telephone number (917) 442-0992.  According to COMPLAINANT, WYLIE contacted VICTIM 2 from telephone number

(517) 918-0253 after VICTIM 2 blocked WYLIE's original number. T-Mobile is the provider for both phone numbers.

10. According to international travel records, WYLIE departed the U.S. on May 25, 2025. As of July 30, 2025, there was no record of WYLIE reentering the U.S. Therefore, I believe Wylie sent the threatening texts and voicemails from outside the U.S. to COMPLAINANT, who resides in Michigan. VICTIM 1 resides within the Eastern District of Wisconsin. VICTIM 2 resides in North Carolina.

11. According to COMPLAINANT, WYLIE served two tours in Iraq while in the U.S. Army. COMPLAINANT described him as mentally unstable with anger issues and an alcoholic. After the Army, WYLIE worked for a "contractor" driving dignitaries. (The FBI confirmed that as of 2016, WYLIE claimed he worked for the private security company Triple Canopy. According to open source information, Triple Canopy merged with Academi, which was formerly known as Blackwater.) WYLIE came home from the Middle East to live with his parents in East Lansing, Michigan, after not getting the COVID vaccine. In December 2023, WYLIE assaulted his mother and father and pointed a gun at his father. The parents reported this to the police and obtained a restraining order. COMPLAINANT advised that WYLIE "has a love for guns" and has a lot of them. COMPLAINANT believed WYLIE has access to the money he talked about because of his contract work and how he talked about the amount of money he was paid. According to COMPLAINANT, WYLIE did not want to move back to the U.S. full time because he would have to report the income and pay taxes on it.

12. COMPLAINANT believes that WYLIE is targeting VICTIM 1 because VICTIM 1 requested a welfare check on WYLIE's parents while he was living there, just prior to his assault on them. COMPLAINANT does not know why WYLIE is targeting VICTIM

8

2. According to COMPLAINANT, VICTIM 1 and VICTIM 2 received direct threats from WYLIE via text and voicemail, and COMPLAINANT believed VICTIM 1 and VICTIM 2 reported the threats to local law enforcement.

13. According to WYLIE's criminal history, on December 22, 2023, he was arrested for Assault Excluding Sexual by the East Lansing Police Department, incident number 2336403829, for the assault against his parents. WYLIE was later convicted of misdemeanor domestic violence. An injunctive order entered December 27, 2023, currently bars WYLIE from purchasing or possessing firearms. The injunctive order expires on December 23, 2025. However, it is unknown if WYLIE still possesses or has access to firearms. As of December 2023, East Lansing Police Department observed several firearms in the East Lansing home where WYLIE resided at the time.

14. On July 30, 2025, FBI SA Robert Rice interviewed VICTIM 1, who resides at a known address in the Eastern District of Wisconsin. On June 14, 2025, VICTIM 1 reported threats and threatening behavior from WYLIE to the Caledonia Police Department (CPD). VICTIM 1 later learned from COMPLAINANT that WYLIE hired someone to kill VICTIM 1 and VICTIM 2. On July 31, 2025, your Affiant and FBI Task Force Officer Caleb Porter interviewed VICTIM 1 and learned WYLIE did not directly send threatening messages or calls to VICTIM 1. VICTIM 1 reported the threats to CPD, who increased patrols in VICTIM 1's neighborhood and will put out a safety bulletin to the department. VICTIM 1 is afraid for their safety, their family's safety, their neighbor's safety, and the safety of the CPD officers as VICTIM 1 does not want WYLIE to hurt anyone. VICTIM 1 is installing a Ring Doorbell and surveillance cameras at VICTIM 1's residence.

15. On July 31, 2025, FBI SA Richard Sutherland interviewed VICTIM 2, who resides at a known address in North Carolina. In June 2025, WYLIE left VICTIM 2 several voice messages to tell VICTIM 2 that VICTIM 2 was a "cunt" and a troublemaker and that he would come talk to her about it in person. WYLIE never made a direct threat to VICTIM 2 but felt his language about seeing VICTIM 2 in person was a veiled threat. Because of these messages, VICTIM 2 reported them to local law enforcement on June 14, 2025. VICTIM 2 did not keep the messages. WYLIE normally tried to communicate with VICTIM 2 from telephone number (917)442-0992. However, on July 9, 2025, WYLIE left VICTIM 2 a voicemail message from telephone number (517)918-0253. VICTIM 2 recognized the caller's voice as WYLIE's. COMPLAINANT shared messages with VICTIM 2 that COMPLAINANT received from WYLIE. VICTIM 2 did not believe WYLIE knows where VICTIM 2 lives.

16. On July 31, 2025, Special Agent (SA) Richard Grout interviewed COMPLAINANT. COMPLAINANT provided SA Grout with three audio files of voicemail messages she received from WYLIE. The transcripts of two of the voicemail messages are documented above. In the third voicemail, WYLIE asked COMPLAINANT to return his call at telephone number (917)442-0992. COMPLAINANT confirmed that COMPLAINANT shared WYLIE's threatening messages with VICTIM 1 and VICTIM 2. COMPLAINANT accidentally sent a text to WYLIE that was meant for someone else. This message indicated that COMPLAINANT shared WYLIE's messages with someone else. Because of this, COMPLAINANT was afraid the WYLIE would target COMPLAINANT as well. However, as of July 31, 2025, WYLIE has not made any direct threats to COMPLAINANT.

17. Based upon the information contained in this affidavit, I believe JOSHUA WYLIE committed the following violations:

a.  Interstate Threatening Communications, in violation of Title 18, United States Code, Section 875(c); and

b.  Murder for Hire, in violation of Title 18, United States Code, Section 1958.

Case 2:25-mj-00954-NJ     Filed 08/04/25     Page 12 of 12     Document 1